# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**WARREN GEORGE MCCONKEY**
and **BETTY JUNE MCCONKEY**,

Debtors.

Case No. **15-60092-7**

---

**XL Feeds, LLC**,

Debtor.

Case No. **15-60150-12**

## MEMORANDUM OF DECISION

At Butte in said District this 28th day of March, 2016.

In the above-captioned consolidated bankruptcy cases, the Court held a hearing at Missoula on February 24, 2016, on the "2nd Amended & Substituted Motion to Remove Chapter 7 Trustee" (Document No. 216[1] in Case No. 15-60092-7) (hereinafter the "Motion to Remove Trustee") filed by the Debtors and James H. Cossitt, PC, an administrative creditor (together the "Moving Parties"). The Trustee Christy L. Brandon ("Brandon" or "Trustee") filed objections and appeared at the hearing and testified, represented by attorneys Kyle W. Nelson and Robert K. Baldwin of the law firm Goetz, Baldwin & Geddes, P.C. (the "Goetz firm"). The Moving Parties

---

[1] The Moving Parties filed a first motion to remove the Trustee on December 28, 2015 (Doc. 169). On January 11, 2016, they filed a first amended & substituted motion to remove the Trustee (Doc. 190).

1

were represented by attorneys Mary DeNevi and James H. Cossitt ("Cossitt"). Debtor Warren

George McConkey ("Warren") testified. Cossitt testified both as a fact witness and as an expert.

Cossitt gave opinion testimony on the fiduciary duties of bankruptcy panel trustees and whether

Brandon breached her fiduciary duties. Auctioneer for the estate Todd Gardner ("Gardner")

testified. Exhibits ("Ex.") A, B, C, D, E, F, G, H, I, J, K, L, M, and Ex. 1 – through – 23, 25, 26,

27, 28, 29, and 32, and 33 were admitted into evidence. At the conclusion of the parties' cases-

in-chief, the Court deemed the Motion to Remove Trustee submitted and took it under

advisement. After review of the record and applicable law, for the reasons set forth below the

Court will deny the Motion to Remove Trustee under 11 U.S.C. § 324.

This Court has jurisdiction of these consolidated bankruptcy cases under 28 U.S.C. §

1334(a). This contested matter is a core proceeding under 28 U.S.C. § 157(b)(2).

### FACTS & PROCEDURAL HISTORY

Warren George McConkey ("Warren") and Betty June McConkey (together

"McConkeys" or "Debtors") are married and reside on a farm located at 3925 Lower Valley

Road, Kalispell, Montana. They own co-Debtor XL Feeds, LLC, of which Warren is president,

through which they were engaged in the business of manufacturing livestock feed pellets at the

same address. Warren testified about crop share arrangements which Debtors had with other

persons and, as an example, named Paul Strasden as owner of a two-third's interest in the

Debtors' hay crop. Warren recently began receiving social security benefits; his mobility is

impaired.

McConkeys contacted Cossitt about litigation they had pending in Montana state court

against lienholders and secured creditors, including Whitefish Credit Union ("WCU") and

Brophy Farms, Inc. ("BFI"). Cossitt of James H. Cossitt, PC, is an experienced bankruptcy practitioner with several years of practice in this Court and other districts, and a former panel trustee. Cossitt is a member and participates in legal organizations and forums with a focus on bankruptcy law. He is an acknowledged expert in bankruptcy law. The Debtors retained Cossitt and his law firm as their attorney at an hourly fee arrangement.

Cossitt testified that in the summer of 2014 the McConkeys signed a confession of judgment in state court litigation involving a foreclosure action by WCU against them. On February 24, 2015, Cossitt filed McConkeys' Chapter 12 petition, and filed their Schedules and Statement of Financial Affairs on February 27, 2015, listing assets totaling $2,004,307.91 and liabilities totaling $2,284,076.58. Brandon was added to Case No. 15-60092-12 as Chapter 12 Trustee on February 24, 2015. Brandon's law office is located in Bigfork, Montana, which is several miles southeast of Kalispell.

Cossitt filed XL Feeds, LLC's Chapter 12 petition commencing Case No. 15-60150-12 on March 10, 2015. On the same date Debtors filed a motion for substantive consolidation of the two Chapter 12 cases on the grounds their debts and financial affairs were "inextricably intertwined" and consolidation would help them propose a feasible plan. When no objections were filed after notice, on April 1, 2015, the Court granted the motion and substantively consolidated the two cases. Brandon succeeded as Chapter 12 Trustee in the XL Feeds, LLC, bankruptcy case on April 6, 2015.

On June 10, 2015, Cossitt on Debtors' behalf filed an adversary complaint in Adversary Proceeding No. 15-00017 ("AP 15-17") against WCU seeking a money judgment and to avoid WCU's foreclosure judgment as a preference under 11 U.S.C. § 547, and to hold WCU liable for

3

avoided transfers under 11 U.S.C. § 550(a)(1). Debtors filed an amended complaint on June 28, 2015, adding claims for relief against their former attorney Darrell S. Worm ("Worm") and his law firm Ogle & Worm, PLLP ("Ogle & Worm"), for breach of contract, negligence and breach of fiduciary duty in representing Debtors in the confession of judgment.[2] By stipulation dated October 13, 2015, Brandon was substituted as plaintiff in AP 15-17, and Cossitt withdrew as plaintiffs' counsel of record.

Cossitt also filed on June 10, 2015, on behalf of the Debtors, a complaint against BFI initiating Adversary Proceeding No. 15-00018 ("AP 15-18"). The complaint prayed for avoidance of BFI's judicial liens against their property under 11 U.S.C. § 544(a) as a result of WCU's foreclosure action and to impose liability against BFI for avoided transfers under § 550(a)(1). Debtors filed an amended complaint adding claims for relief based on equitable subordination under 11 U.S.C. § 510(c) and for negligent misrepresentations by BFI regarding its proof of claim. Brandon was substituted as plaintiff in AP 15-18 on October 13, 2015, although she testified that she began working on AP 15-18 on October 6, 2015. Brandon described the two adversary proceedings as "entangled litigation."

WCU filed Proof of Claim No. 19 on July 8, 2015, asserting secured and unsecured claims totaling $1,379,205.89 based on its foreclosure judgment, secured by real estate and other property. Debtors filed an objection to WCU's Proof of Claim on September 9, 2015, on the grounds WCU failed to attach required security documents and the claim is overstated. WCU

---

[2] Brandon reached a settlement with Ogle and Ogle & Worm for the sum of $10,000, which was approved, and the claims against them in AP 15-17 were dismissed with prejudice. Brandon testified that she moved more quickly to resolve the claims against Ogle and Ogle & Worm because litigating those claims would have required her to employ an expert witness.

filed amended proofs of claim on November 18, 2015, and January 28, 2016.  The most recent

amended Proof of Claim 19 states the same total claim amount, but reduced the secured claim to

$1,149,000 and includes lists of equipment, machinery, tools and cubing equipment.

BFI filed Proof of Claim No. 20 on July 9, 2015, asserting a secured claim in the amount

of $175,556.40 secured by real estate and other property perfected by a UCC-1 and a judgment.

The attachments to Claim 20 include the foreclosure judgment from the state court case brought

against Debtors by WCU, Cause No. DV-13-1291B in the Montana Eleventh Judicial District

Court; the stipulated judgment in favor of BFI against XL Feeds in No. DV-12-02 in the Montana

District Court for the County of Pondera; the confession of judgment in the same case by the

McConkeys; and UCC-1 financing statements listing cubing equipment.  Debtors filed an

objection to BFI's Proof of Claim on September 9, 2015, alleging that the value of security was

overstated, that BFI's lien against real estate was terminated by the judgment and that BFI's lien

against other property is not supported by attached security agreement.

Both of Debtors' objections to claims of WCU and BFI were set for hearing in November

of 2015.  Those hearings were continued; Debtors eventually filed a withdrawal of  their

objections (Doc. 219).

The McConkeys converted their case voluntarily to Chapter 7 on September 24, 2015.

Brandon was removed as Chapter 12 Trustee and was added to the case as Trustee under Chapter

7 on the same date.  A § 341 meeting of creditors was scheduled to be held on November 6,

2015.

After the McConkeys' case was converted, Cossitt sent Brandon emails on September 24,

2015, and September 25, 2015, discussing the status of the adversary proceedings and the

Debtors' appeal in the Montana Supreme Court, debtor-in-possession ("DIP") bank accounts, postpetition schedules, insurance and livestock. Ex. A. Cossitt testified that Debtors offered to allow the Trustee to inspect the assets in late September of 2015. Cossitt stated that he and the Debtors were available to meet with Brandon on the morning of October 7, 2015, and that he was available to be employed as special counsel to the Trustee on some of the listed matters. Ex. A. He informed Brandon, however, that he would be out of state after October 7, 2015, until at least November 3, 2015.

Brandon testified that, after conversion, her priority was to administer the "litigation assets," i.e., the adversary proceedings and state court appeal. She was facing deadlines set by scheduling orders and had an appellate brief due; she testified that her initial efforts were to investigate the appeal.

Cossitt and Brandon spoke by telephone on September 30, 2015, after which Cossitt sent Brandon a follow up email, Ex. B, discussing Debtors' wishes regarding ongoing utility bills and claims of attorney-client privilege in documents related to the appeal which were to be turned over to the Trustee. Ex. C is an email from Cossitt to Brandon dated October 1, 2015, discussing the McConkeys' claims of privilege, document production, and asking whether Brandon will abandon the real estate and buildings. Cossitt sent Brandon all non-privileged documents on a flash drive.

Brandon testified that, based on her review of the proofs of claims filed and Cossitt's flash drive, she concluded that it was not in the best interests of creditors to hire counsel. She declined to employ Cossitt as special counsel. Instead of litigating the adversary proceedings and prosecuting the Debtors' appeal, Brandon testified, she wanted to negotiate settlements.

6

Debtors filed their post-conversion amended Schedules and Statements on October 7, 2015. Amended Schedule B lists Debtors' personal property, including DIP bank accounts and at item 32 interests in crops. Ex. 4, pp. 16-17, lists Debtors' crop share arrangement with Paul Strasden and crop lease with landlord Gary Cease.

On amended Schedule C the McConkeys claimed a homestead exemption on their real property, including the feed plant, shop, grain building, grain bins and residence, under Montana homestead statutes. In addition, in a box in red print on Schedule C they stated the following: "Homestead exemption is also based on the right of possession during the redemption period per MCA 25-13-821.[3]" Warren testified that he understood that he was entitled to possession of his real property for a period of one year from the date of repossession.

Cossitt testified that under the current rule in this district a right of redemption is not entitled to exemption; but he testified that the right of redemption allows a debtor possession, and that therefore redemption and possession come as a package and Debtors made a good faith attempt to expand their exemptions to include the right of redemption. Brandon testified that amended Ex. C does not refer to or claim an exemption in Debtors' right of redemption, which she understands is based on a separate and distinct statute from the right of possession.

On October 7, 2015, the same date Debtors filed their amended Schedules, the Trustee filed a notice of intent to abandon 2 horses and a dog. That notice was approved without

---

[3] Section 25-13-821 ("Possession of lands during redemption period") provides: "The purchaser of land at execution sales is not entitled to the possession of the land as against the execution debtor during the period of redemption allowed by law while the execution debtor personally occupies the land as a home for the debtor and the debtor's family. The intention of this section is to ensure to the debtor the possession of the debtor's land during the year of redemption."

7

objection on October 26, 2015.

Ex. D is an email string including Cossitt, Brandon, and BFI's attorney Jon Binney ("Binney"). Ex. D begins with Binney asking to coordinate with the Trustee a time for a potential buyer to go on to Debtors' property and view the estate's cubing equipment. The Trustee replied that Binney should coordinate with Cossitt and the Debtors. On October 20, 2015, Cossitt replied. Ex. D. Cossitt stated that he advised his clients of their duty to cooperate with the Trustee. However, Cossitt limited the Debtors' availability outside the meeting of creditors to the Trustee and her professionals to a "single onsite meeting" in bold letters. Ex. D. Cossitt suggested half a day prior to the § 341 meeting for the "single onsite meeting" and stated that Debtors were not inclined to participate in any buyer inspection. Again stating that Debtors "will reasonably cooperate as called for under the Code[,]" Cossitt stated that it is the Trustee's responsibility to possess and administer the estate assets and that "My clients want no part of it." Ex. D.

Cossitt then stated that his clients desire his presence at any meeting with the Trustee and her professionals, and that "I will not be allowing opposing counsel access to my clients under any circumstances." Ex. D. Cossitt states in Ex. D:

> Bottom line: they will reasonably cooperate with the trustee to administer the estate, but they do not want anything to do with prospective purchasers, showing the equipment or dealing with parties who are now on scene to dismantle their former lives. Too much emotion tied up in it, too much potential for repetitive time consumption, they are not being paid to do it and derive no benefit. They do not wish to be exposed to their creditors, counsel or agents other than in the formal process.

Ex. D.

Cossitt testified that his clients wanted a single inspection because they did not want to

incur additional attorney fees for Cossitt to participate in several inspections which the creditors wanted. Warren testified that Debtors had received multiple requests for inspection from a creditor named Keystone Equipment Finance Corp. ("Keystone"). Warren was concerned with the costs of such inspection because of Cossitt's fees, which cost the Debtors $250 for each inspection, so they wanted to charge Keystone for inspections.

Brandon responded to Cossitt on October 23, 2015, telling him that she would be at McConkeys' property on November 3 at 1 p.m. Ex. E. Cossitt testified that he believed that Brandon had agreed to a single inspection. Ex. E does not contain such an agreement by Brandon.

With respect to Adv. No. 15-18, Cossitt states in Ex. D that the stipulation filed in that adversary proceeding "has been approved twice by me" and he asked the Trustee to file it. Cossitt requested that the Trustee coordinate joint trial proceedings with Debtors' objections to proofs of claims of WCU and BFI because they overlap with the adversary proceedings. Cossitt concluded his email of October 20, 2015, in Ex. D: "At this stage of the game, my concern about this aspect has to do far more with my 2nd tier admin claim than anything else."

On October 23, 2015, the Trustee filed a notice of intent to abandon property of the estate consisting of a pellet plant and 2005 Dodge pickup truck, subject to a lien held by Keystone. Cossitt testified that this particular creditor held a purchase money security interest in the collateral. That notice of intent to abandon was approved on November 12, 2015.

The onsite inspection at Debtors' property took place on November 3, 2015, at 1 p.m. Cossitt testified that he and Debtors blocked off an entire afternoon on November 3, 2015, for the inspection. Warren attended the inspection, as did representatives from BFI and WCU. Brandon

attended the inspection at 1 p.m. on November 3, 2015.  Brandon testified that she wanted to examine the Debtors' cuber and pellet equipment on November 3, but that Cossitt set conditions for her to inspect the pelleter.  She testified that she had another obligation which compelled her to leave the inspection after about an hour because of technical problems at her office, which she was converting from a PC-based to a cloud-based system.   Cossitt testified that Brandon made no further request for inspection until she requested a next-day inspection on January 13, 2016.

The Debtors attended the § 341 meeting on November 6, 2015.  Cossitt described the meeting as normal; one other farmer attended.  The Trustee spoke with the Debtors about their assets at the § 341 meeting, including their vehicles and crops.  Cossitt testified that the Trustee's scope of questions about crops was "small."  Brandon testified that she asked the Debtors about crops at the § 341 meeting.  Her understanding was that landowner Paul Strasden ("Strasden") owned a two-third's share of certain crops and the estate owned a one-third share, but she testified that Strasden told her the issue was not so clearcut.  Brandon testified that she called Strasden after the § 341 meeting in November of 2015 trying to sell the crops.  Brandon believed from her investigation that WCU had a blanket lien on crops, and Strasden refused to sell the crops and wanted to come to Debtors' property and pick up hay.

Cossitt testified that Brandon asked the McConkeys at the § 341 meeting whether they wanted to purchase any of the estate's vehicles.  Ex. 9 is the Trustee's notice of intent to sell a 1941 Cadillac and trailer to the Debtors at a private sale, dated November 24, and that sale was approved.

### DIP Accounts.

Regarding the Debtors' DIP accounts, Cossitt testified that the Trustee "sat" on the DIP

accounts for a month.  Brandon testified that Cossitt told her about the DIP accounts on

September 28, 2015.  Cossitt testified that "it appears" by the date of the hearing on February 24,

2016, that Brandon had taken possession of the DIP accounts, but he asserted that she didn't do it

promptly or in a timely manner.  Warren testified that because the DIP accounts were not closed

in a timely manner it caused an overdraft for Debtors' insurance, and that Warren's first social

security check was sent to the DIP account and returned to the Social Security Administration,

which took 2 or 3 weeks to get resolved.  Debtors contend that Brandon's failure to close out the

DIP accounts breached her fiduciary duties and had the result of  Warren's social security checks

being deposited in a DIP account by mistake.

Brandon testified that she asked the Debtors to close the DIP accounts, which she

explained debtors in cases in which she serves as trustee usually agree to do, but the Debtors

refused.  Ex. 5 includes a letter from Brandon to Glacier Bank dated October 12, 2015, informing

the bank of her Trustee's interest in any bankruptcy DIP accounts, and instructing it not to honor

any checks or withdrawals and to close the DIP account and turn over to Brandon any funds on

deposit.

Ex. 5 also includes a similar letter to Three Rivers Bank of Montana dated October 12,

2015.  Ex. 6 is a money order from Three River Bank of Montana in the sum of $113.65 written

to the order of Christy Brandon Trustee dated October 23, 2015, and bank statements dated

09/04/2015 and 10/05/2015.  The amount of the money order is the same as the ending balance

on the 10/05/2015 statement on Ex. 6, resulting in a $0 balance.

Ex. 7 is a letter from Glacier Bank to Brandon dated December 7, 2015.  In Ex. 7 Glacier

Bank states that it issued a check to Warren for $1,722.90 for his social security check, which

had been deposited on November 23, 2015, and the remaining balance in the DIP account was enclosed and the bank would close McConkeys' DIP account as well as close the XL Feeds DIP account which had a negative balance.  Glacier Bank also enclosed DIP account statements for September, October and November.  Ex. 7.   Brandon agreed that Ex. 7 was not a prompt response.  She testified that the delay in Glacier Bank's response resulted from her use of the address for Glacier Bank used in Debtors' amended Schedules, and that her initial enquiry went to the wrong address.[4]  Ex. 7 states that Brandon had a conversation on December 7, 2015, with the Collection Department at Glacier Bank which resulted in the bank's letter on Ex. 7.

Cossitt admitted that he had no first hand knowledge of the Trustee's administration of the DIP accounts; but he testified that in his opinion she did not close the DIP accounts in a timely manner.  Brandon testified that she completed administering Debtors' DIP accounts by December 7, 2015.

### Settlements & Other Administration

As of Thanksgiving 2015, Brandon testified, she had completed the § 341 meeting, had a handle on the litigation assets and had a plan for the estate's remaining vehicles.  What remained was to obtain bankruptcy court approval of settlements, administer vehicles and resolve the issues related to crop interests and liens.

On November 18, 2015, the Trustee filed her motion to authorize settlement with WCU, a stipulation to modify stay and abandonment of real property, farming equipment and implements and a release of all claims against WCU in return for payment by WCU to the estate in the sum of

---

[4] Brandon sent her letter to Glacier Bank in Ex. 5 to Glacier Bank at 2199 Highway 2 East, Kalispell, MT 59901.  Glacier Bank's reply in Ex. 7 states Glacier Bank's address as P.O. Box 1544, Bigfork, MT 59922.

$10,000.  (Doc. 134-136).  On November 19, 2015, Cossitt sent Brandon an email asking about inconsistent notice periods in Doc. 134-136 and asking whether they are the same document.

The Trustee filed a similar motion to authorize a settlement with BFI on November 24, 2015, combined with a stipulation for stay relief and abandonment of the estate's cubing equipment and a release of claims, in exchange for a payment to the estate in the sum of $4,000. (Doc. 138-140).  Pending the settlements, the parties agreed to continue the hearings on Debtors' objections to WCU's and BFI's Proofs of Claim.

Brandon admitted that she did not utilize the appropriate Montana Local Bankruptcy Form ("Mont. LBF") 8 ("Stipulation to Modify Stay") for her initial motions to approve settlements with WCU and BFI.  She testified that her usual practice is to use and follow the local bankruptcy forms, but because of the relief requested by WCU and BFI, which combined stay relief and abandonment, her initial settlement motions did not follow LBF 8.  They did not include the Debtors' signatures as called for by LBF 8.  She testified that she included much of the information required by the local form with respect to abandonment, but admitted that it was not provided in the manner required by the local form.

On December 4, 2015, Cossitt filed his final application for compensation as Debtors' attorney requesting awards of attorneys fees in the amount of $22,016.00 plus costs in the amount of $176.57, and also requesting final approval of interim awards totaling $49,811.41, and requesting that the Trustee be directed to pay Cossitt $34,809.00 as an allowed administrative claim.  No objections were filed to Cossitt's final application.  On December 22, 2015, the Court approved Cossitt's application, except that all of the awarded fees and costs were allowed as

13

second tier administrative expenses[5] of the Chapter 7 estates.

On December 8 and 9, 2015, Cossitt, on behalf of McConkeys and James H. Cossitt, PC, as administrative creditor based on his second tier award of fees and costs, filed objections to the Trustee's proposed settlement with WCU.  Cossitt testified that the property descriptions in the WCU settlement and abandonment were vague and inadequate, that Debtors were not parties to the settlement and that the stipulation to modify stay portion was not in conformity with LBF 8; that the abandonment portion was not in conformity with LBF, that the Trustee was trying to abandon equity and sell Debtors' exempt property and that there was inadequate notice of the settlement.

On December 16, 2016, Cossitt filed objections to the Trustee's proposed settlement motion and stipulation for relief from stay with BFI (Doc. 155).  Cossitt's objections to the settlement with BFI are similar to his objections to the WCU settlement, i.e., that the descriptions of the personal property are vague and Debtors' signatures were required by local rule. Cossitt was asked on direct examination if he asked the Trustee about his objections and he answered "No – I just filed the objection."  He testified that he still doesn't know what WCU's security is.  Brandon testified that she could have cured Cossitt's procedural issues raised in his objections, but that most of the objections centered on her discretion and exercise of business judgment as Trustee.

Cossitt alleged that the deficiencies in the settlements with WCU and BFI showed bias by the Trustee, and as a result, the Moving Parties have "zero faith" in Brandon's ability to

---

[5] Administrative expenses allowed under 11 U.S.C. § 503(b) have second priority under 11 U.S.C. § 507(a)(2).

administer the estates.  Brandon was asked on direct examination whether her first motions to approve settlements with WCU and BFI were filed in order to bias the Debtors and the administrative creditors, and she answered "No."

She testified that, because of the objections to her first motions to approve settlements with WCU and BFI, she knew she would be a witness at any hearing.  For that reason the Trustee filed an application to approve employment of attorney Benjamin Hursh and the Law Firm of Crowley Fleck, PLLP, on December 21, 2015, and that application was approved.

Cossitt filed the first motion to remove Brandon as Trustee on December 28, 2015.  Doc. 169.  The motion, citing trustee duties discussed in "The Fiduciary and Institutional Obligations of a Chapter 7 Bankruptcy Trustee," by Hon. Steven Rhodes, 80 Am Bankr. L.J. 147, 154-55 (Spring 2006), seeks removal of Brandon as trustee pursuant to § 324 for intentionally or negligently breaching statutory and fiduciary duties and lack of diligence by:  (1) failing to close or take possession or control over DIP bank accounts; (2) failure to insure, administer, and liquidate vehicles of the estate;[6] (3) failure to insure, administer and liquidate crops in the bins; (4) failure to prepare for litigation and bias or hostility by the Trustee toward Debtors in her settlement motions by failing to include the Debtors, (5) failure to comply with local rules and (6) failure to use the proper local LBF, which forced the Debtors and at least one creditor (WCU) to incur ongoing legal fees to flesh out missing information.

Brandon testified that Cossitt did not discuss the timeliness of her administration of the DIP accounts at any time before he filed the Motion to Remove Trustee.

_____

[6] At the hearing Cossitt acknowledged that, because the vehicles, trailers and snowmobiles were abandoned, Brandon's administration of estate vehicles no longer is grounds for her removal.

On December 31, 2015, Brandon filed withdrawals of both motions to approve settlements with WCU and BFI.  A discharge of the Debtors was entered on January 7, 2016.

On January 11, 2016, Cossitt filed an amended motion to remove the Trustee (Doc. 190). The amended motion to remove added argument that, based on the Trustee's failure to use the local forms, the Debtors are incurring ongoing legal fees indicating the Trustee's bias or hostility to Debtors.  Cossitt testified that he has never before filed a motion to remove a trustee.  He testified that the "big thing" is that they "had to do these things twice" and the settlements should have been done right the first time.

Cossitt explained that, at the time of the first settlement motions, there was approximately $24,000 coming into the estate and almost no administrative expenses because Brandon filed the first motions herself.  Then, he testified, Brandon hired attorneys for the estate and her legal fees and expenses consumed estate assets which Cossitt argues should go to paying his administrative claim and the second tier administrative claims of two other creditors.

Brandon testified that, prior to the Moving Parties' Motion to Remove, the estate's administrative expenses consisted of Hursh's fees at an hourly rate, Gardner's auctioneer fees and her trustee fee.  She estimated that Hursh's fees would have been $12,000; that her trustee compensation would have been approximately $7,000 from a $60,000 estate, and that without the Motions to Remove she expected there would have been a distribution to second tier administrative creditors.  She testified that the bulk of administrative expenses of these Chapter 7 estates are related to the Moving Parties' Motions to Remove Trustee and objections to settlements.  Under cross examination by Cossitt, Brandon testified that if her first proposed settlements with WCU and BFI had been approved there would have been between $30,000 and

16

$35,000 in the estate and administrative expenses would have totaled between $7,000 and $8,000.

On January 11, 2016, the Trustee filed her application to employ Robert K. Baldwin ("Baldwin") and the Goetz law firm as special legal counsel for the estate to defend against Debtors' and Cossitt's motion to remove Trustee. Brandon testified that she filed the application to employ Baldwin and the Goetz firm because she believed she would have to testify as a witness in the contested Motion to Remove her as Trustee. The agreement for legal services attached to the application to employ the Goetz firm states that the client is Brandon as Trustee and Brandon individually. At the hearing, however, testimony in another hearing held in this case involving the same parties was admitted stating that Baldwin would not seek payment from Brandon individually.

Brandon requested another inspection of Debtors' vehicles/trailers and snowmobiles to be performed with auctioneer Gardner on January 13, 2016. Ex. H. Cossitt asked Brandon to take the opportunity during the inspection to investigate the crops in the bins, because they were uninsured. Warren testified that, other than closing the DIP accounts, his only issue with his treatment by the Trustee in this case is that he expected that the inspection of the animal feed would be more derivative of the administration of the crops.

Cossitt stated on January 12, 2016, that he would not be present at the inspection and he asked Brandon to limit her conversation with Warren to vehicles and crops, to which she agreed. Ex. H. Brandon testified that she went to Debtors' property with Gardner expecting positive results from the inspection based on the Debtors' approximate $35,000 scheduled value for vehicles. However, the results were not positive. Gardner informed Brandon that the vehicles

17

were worth much less than $35,000.[7]

Ex. 26 is an email string between Cossitt and Trustee's attorney, Benjamin Hursh, ending on January 21, 2016, regarding barley and hay crops, and Cossitt's opinion that WCU has no lien on the 2013 crop year or post-petition hay, which is subject to a crop share lien. Cossitt testified that the Trustee's repetitive requests for information and inspections are too much to ask of the Debtors. Cossitt stated in Ex. 26 that the Trustee had a fiduciary duty to administer the hay since it was free of liens. In an earlier email the same day, Cossitt asked why he should provide the Trustee with background, familiarity with the case and expertise at no charge when he was not employed by the Chapter 7 estate, as he felt he should have been. Cossitt wrote:

> 1. Why ask for my advice and input if I am not employed by the C7 estate? You and your client think my human capital is a free commodity? You want to tap into my background and familiarity with the case, expertise in this area for no charge? all the more reason that the C7 estate should have employed C12 DIP counsel who already has that knowledge and background. Another ground for objection to the retention of Goetz Law Firm.

Ex. 26.[8]

On January 22, 2016, the Trustee filed a second round of motions for settlement, general releases and abandonment of assets with BFI and WCU, (Doc. 203 and 205). She filed notices of intent to abandon property of the estate (Doc. 204 and 206). The second proposed settlements contemplated payments to the estate in the amount of $4,000 by BFI and $20,000 by WCU. Brandon testified that the second proposed settlements were similar to the first except that BFI made concessions with respect to its security in the cubing equipment and WCU increased the

---

[7] Debtors' vehicles had been left outdoors, and several had not been started in years.

[8] The foregoing was preceded by Cossitt's reference to "some family matters." At the hearing he explained that his father passed away. The Court sympathizes for Cossitt's loss.

amount it paid the estate by $10,000 in exchange for conveyance by the Trustee of the right of redemption by quitclaim deed.[9]

Debtors filed objections, Cossitt testified, in part because the settlements purported to cover exemptions claimed by Debtors in their real property based upon their right of redemption. Warren testified that he was concerned that the Trustee was trying to sell his redemption rights; his anxiety was not resolved until the night before the February 24, 2016 hearing when the parties reached a settlement. Cossitt further testified that Brandon took over and settled with WCU without reviewing security documents which WCU omitted from its proof of claim.

Brandon testified that she phoned Strasden about the estate's crops again in January of 2016, after WCU agreed to limit its lien on crops. Brandon again asked Strasden to agree to sell the hay. Brandon explained that a condition described in amended Schedule B, under which Strasden would get an additional one-third of the alfalfa hay, had been satisfied thereby increasing Strasden's share of the alfalfa hay to two-thirds. This time, she testified, the Trustee and Strasden agreed to sell alfalfa hay at auction and split the proceeds two-thirds to Strasden and one-third to the estate.[10]

Ex. I is a letter dated January 26, 2016, from the Trustee's attorney Baldwin to Cossitt regarding the Trustee's intention to abandon vehicles and crops. Baldwin asked about the value of Debtors' vehicles scheduled at $31,700, versus an appraisal the Trustee obtained valuing the vehicles at $9,000 and about Debtors' valuation of crops at $11,368.

---

[9] Brandon testified that the second settlement with WCU used a quitclaim deed to convey the right of redemption because she was not sure what the rights of redemption were.

[10] Brandon testified that Strasden called her and told her that he received a check from a party identified as Marinnan Trucking, after Warren said that he had sold alfalfa hay.

Cossitt testified that Ex. I shows that Baldwin was running up attorney fees against the estate for routine trustee duties. He testified that he does not know what response he made to Baldwin's letter, other than the Debtors' continued "constructive participation." At the time of the hearing on February 24, 2016, Cossitt testified that the hay crops referenced in Ex. I had not been abandoned or sold.[11]

The Trustee filed a notice of abandonment of vehicles, trailers and snowmobiles on January 26, 2016, after her January 13 inspection. Ex. 10. No objections were filed and the vehicles were abandoned, but Cossitt testified that the Trustee did nothing about the vehicles until he filed the motions to remove the Trustee. Brandon testified that she did not obtain insurance on the Debtors' vehicles because it was not in the estate's best interest to do so; she had only about $1,000 in the estate.

Brandon testified that her administration of vehicles is complete. Cossitt testified that if the Trustee had inspected the vehicles with diligence earlier in the case it would not have been winter. The delay affected the Debtors' ability to make other plans. Given the abandonment of the vehicles, Cossitt admitted that the result to the estate was "probably" the same.

Ex. 27 is an email string between Cossitt, Trustee's attorney Hursh, and attorneys for WCU and BFI ending February 2, 2016, discussing settlement. Cossitt proposed, as part of a complete settlement, withdrawing his Motion to Remove the Trustee and release her from personal liability provided the parties reach a "package deal" and "comprehensive finality."

---

[11] At the hearing Warren provided the Trustee with a phone number for a prospective purchaser. The Trustee telephoned John Marrinan at the number provided by Warren. As a result, the Trustee reached an agreement to sell the estate's interest in alfalfa hay to Marrinan Trucking free and clear of liens and interests for $3,600. Doc. 270. That motion to sell was granted on March 8, 2016.

Cossitt and Hursh exchanged emails on February 4, 2016, regarding settlement.  Ex. 28. Hursh proposed terms of settlement between the Trustee, WCU and the Debtors.  Cossitt replied in part:  "Please quit screwing around and get a comprehensive response" instead of pursuing a "divide and conquer" approach which did not resolve the motion for removal limited to the WCU matter, to which Cossitt replied in all caps:  "FORGET IT."  Ex. 28.

Later on February 4, 2016, Debtors and Cossitt filed their second amended Motion to Remove the Trustee (Doc. 216).  In addition to the DIP accounts, vehicles, crops and failure to follow local rules and forms in the settlement and abandonments, additional grounds for removal were added to the second amended Motion to Remove.  They include:  breach of the duty of loyalty to maximize distributions based on the Trustee's retention of the Goetz Law firm by the estate, instead of by her individually, to defend against the motions to remove; breach of the duties of care and diligence by proposing to sell the Debtors' exemption in redemption rights to which no objection had been filed, thus depriving the estate of $10,000 and rendering the Trustee not disinterested and therefore ineligible to serve as a trustee; and breach of duties of due care, impartiality, good faith and fair dealing by attempting the conversion and sale of Debtors' redemption rights.  Doc. 216.

At the hearing Cossitt clarified that the Motion seeks removal of Brandon as Trustee in the instant consolidated Chapter 7 cases only, and that he has no concerns about Brandon serving as trustee in other bankruptcy cases.  In addition to removal of Brandon as Trustee, the Moving Parties are asking the Court to deny the Trustee's compensation, to subordinate the Chapter 7 administrative expenses to the administrative expenses awarded under Chapter 12 and for the

Court to order Brandon to pay all of Debtors' legal fees.  Warren testified that Cossitt has billed Debtors approximately $16,000 for post-conversion legal fees.

On February 5, 2016, Cossitt, as administrative creditor, sent Brandon's attorneys at the Goetz firm an email stating that if the Trustee did not respond to the Motion to Remove by February 9, 2016, Cossitt would forward the Motion to Remove Brandon to the United States Trustee's ("UST") offices demanding that Brandon be removed for lack of disinterestedness.  Ex. 29.  The Trustee filed her response to the second amended Motion to Remove on February 17, 2016.  Cossitt testified that he did not report Brandon to the UST, but that he intends to.  Brandon testified that no other parties have joined the Debtors' and administrative creditor's Motion to Remove Trustee.

Also on February 5, 2016, Cossitt filed a withdrawal of Debtors' Objections to WCU's and BFI's Proofs of Claim.  Doc. 219.  Notwithstanding that withdrawal of objections and the approved settlement, Cossitt testified that the Proof of Claims objections still are pending.[12]

Ex. 32 is an email string between Cossitt and Brandon, and her attorneys, ending February 19, 2016.  The Trustee had asked on February 18, 2016, to come on to the property at 4 p.m. the following day to inspect the estate's alfalfa hay quantity and quality with the auctioneer.  Ex. 32.  Cossitt's reply refused.  Cossitt states in Ex. 32 that the Trustee abandoned the real estate and she no longer has permission to access it; the two prior inspections by the Trustee "have fulfilled the duty of reasonable cooperation;"[13] and that Debtors will address it after the court rules on their Motion to Remove.

_____

[12] The Debtors' Proof of Claim objections are withdrawn, not pending.

[13] Cossitt stated that the inspection of November 3, 2015, was confirmed by the Trustee in writing in order to cover a wide range of topics, "and unilaterally breached by you."  Ex. 32.

Cossitt followed up with another email dated February 19, 2016, Ex. 33, stating that the Trustee's request is "another ground for no more inspections" because she was permitted to inspect the crops once before, and concluded: "Your inability to handle this case diligently is before the court and will be addressed next week. After the Court rules, if you are still trustee, we can come back to it." Ex. 33. Notwithstanding Ex. 33, Cossitt testified that Debtors "tried to cooperate" after they filed their Motion to Remove. Cossitt testified about the Trustee's breach of duty by failing to timely sell Debtors' hay, stating that she lacked diligence in getting to the property to secure the hay and that her delay in selling the 85 tons of hay caused a loss when the price of hay dropped $20 per ton.

The night before the February 24, 2016 hearing, the parties met and reached a resolution of the objections by Debtors and Cossitt to the Trustee's motions to approve settlements with BFI and WCU. A Stipulation (Doc. 256) between the Trustee, Debtors and administrative creditor, BFI, and WCU was filed, with a proposed order. The Court approved that Stipulation by Order entered on February 24, 2016 (Doc. 257), giving the parties 14 days to file objections. No timely objections were filed.

The approved Stipulation provides for payment by WCU to the estate in the amount of $15,000, instead of $20,000, and payments to Debtors in the amount of $5,000 in consideration of Debtors' cooperation in turning over WCU's collateral, plus $5,000 in return for a quit claim deed from the Debtors and $10,000 for a quit claim deed from the Trustee. In addition the Stipulation provides for the Debtors to vacate real property by June 1, 2016, for Debtors to remove their personal property, to allow WCU access to the real property, for abandonment and dismissal with prejudice of Debtors' appellate litigation in the Montana Supreme Court and for *in*

23

*rem* not *in personam* liability after dismissal of the appeal.  Since no timely objections were filed, approval of the Settlement at Doc. 257 is final.  Cossitt testified that the Trustee no longer must defend against Debtors' objections to settlement.

At the hearing on February 24, 2016, Trustee's attorney Hursh informed the Court that he and the Crowley firm waived any professional fees owing to the estate as special counsel.  Based upon that waiver the Court denied the Debtors' and administrative creditor's objection and request to reconsider order approving employment of Hursh and Crowley Fleck as special counsel.  Doc. 265.

Notwithstanding the settlement, which has been approved and is final, Cossitt testified that removal of the Trustee would not be a hardship on the estate because removal would result in a different, independent trustee being appointed to examine the creditors' claims; investigate the Debtors' right of redemption; examine the $30/ton loss caused by Brandon's delay in selling hay; and examine the run-up of chapter 7 administrative expenses by Brandon.

Cossitt estimated that administration of the estate currently is about 85 percent (85%) complete.  The Trustee estimated that administration is about 90% complete.  She testified that she still is investigating the estate's interest in certain crops, which are the last assets she has to administer.  She abandoned the estate's interests in oat crops, and still has tax returns and applications for compensation to prepare.

Cossitt concluded his direct examination testimony by stating that the cumulative facts in this case and the economic harm to himself and other chapter 12 administrative claimants justifies removal of the Trustee.  He testified that his clients have tried to cooperate, but they want to know when it is going to end.

## DISCUSSION

"A trustee is the 'legal representative' and 'fiduciary' of the estate." *In re AFI Holding, Inc.*, 355 B.R. 139 (9th Cir. BAP 2006), *aff'd and adopted,* 530 F.3d 832, 844 (9th Cir. 2008) (adopting the BAP's analysis as its own) (other citations omitted).  A chapter 7 trustee's role facilitates a fundamental bankruptcy concept of "equitable distribution." *AFI Holding*, 530 F.3d at 844.  The trustee's "primary job is to marshal and sell assets, so that those assets can be distributed to the estate's creditors and then close the estate." *AFI Holding*, 530 F.3d at 845, quoting *U.S. Trustee v. Joseph (In re Joseph)*, 208 B.R. 55, 60 (9th Cir. BAP 1997) (quoting *In re Reed*, 178 B.R. 817, 821 (Bankr. D. Ariz. 1995)); *see also* 11 U.S.C. § 704 (duties of trustee).

The Debtors' Motion to Remove Trustee is based on 11 U.S.C. § 324 which provides: "(a) The court, after notice and a hearing, may remove a trustee, other than the United States Trustee, for cause." *See AFI Holding,* 530 F.3d at 845.  Removal of a trustee "is an extreme remedy." *In re Log & Conventional Homes, Inc.*, 2011 WL 7145883, *4 (9th Cir. BAP 2011), citing *Morgan v. Goldman (In re Morgan)*, 375 B.R. 838, 847 (8th Cir. BAP 2007).  Removal under § 324 for cause "is left to the sound discretion of the bankruptcy court." *AFI Holding*, 530 F.3d at 844 (citing cases)*.* The party seeking removal has the burden to prove specific facts which support removal for cause. *Id.* at 845, citing *Matter of Schultz Mfg. Fabricating Co.*, 956 F.2d 686, 692 (7th Cir. 1992), and *Alexander v. Jensen-Carter (In re Alexander)*, 289 B.R. 711, 714 (8th Cir. BAP 2003), *aff'd*, 80 F. App'x. 540 (8th Cir. 2003).

The Ninth Circuit decision in *AFI Holding* is controlling authority in this circuit and district.  Judge Rhodes' article cited by the Moving Parties is educational and informative, but not controlling.  Another leading bankruptcy commentator writes:

25

The court may remove a trustee from pending cases only "for cause." Cause is not defined in the Bankruptcy Code; it is left for the courts to determine on a case-by-case basis. A conclusory statement unsupported by facts is clearly not enough to warrant removal.

* * * *

Generally, the courts will not remove a trustee absent actual fraud or injury. For example, a trustee was not removed for failure to file a bond promptly. However, some courts have found that removal can be based "not only [on] actual impropriety, but [on] the appearance of impropriety as well."

* * * *

As one court has explained: "A Chapter 7 trustee is given a substantial degree of discretion in deciding how to administer the bankruptcy estate and his or her actions are governed by a business judgment standard." Therefore, a trustee will not be removed for mistakes in judgment where the judgment is discretionary and reasonable under the circumstances. Nor is a trustee required to prosecute every cause of action belonging to the estate. Courts should consider the best interests of the estate, rather than those of a single complaining creditor when determining whether to remove a trustee. However, even an honest trustee may be removed if the trustee loses so much of the creditors' confidence that discord threatens the estate.

3 COLLIER ON BANKRUPTCY, ¶ 324.02 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2012).

Cossitt represents one administrative creditor who, with the Debtors, filed the pending Motion to Remove Trustee. No other creditor filed a joinder to the Motions to Remove. Cossitt stated that two other second tier administrative creditors share the Moving Parties' concerns about the Trustee, but no other second tier administrative creditor appeared at the hearing in support of the Motions to Remove.[14]

Much of the Moving Parties' proof at the hearing and argument in their Motion to

_____

[14] Cossitt did not file a notice of appearance on behalf of other second tier administrative creditors. As a result, Cossitt will not be heard to speak for them.

26

Remove consists of Cossitt's opinions and conclusions regarding the Trustee's duties of diligence, due care, loyalty, impartiality, good faith & fair dealing, proper litigation preparation and alleged bias.  Cossitt is a recognized expert with extensive practice in the field of bankruptcy law as a trustee and as an attorney for debtors and creditors in several jurisdictions; he participates in national bankruptcy organizations and forums.  Rule 702, Fed. R. Evid., allows a witness who is qualified as an expert by knowledge, skill, experience, training or education to testify in the form of an opinion.  An expert opinion is not objectionable just because it embraces an ultimate issue.  Rule 704, Fed. R. Evid.

However, the determination of the weight to be given expert testimony or evidence is a matter within the discretion of the trier of fact – which in a bench trial for the instant contested matter is the bankruptcy court.  *Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir. 1990); *Arkwright Mut. Ins. Co. v. Gwinner Oil Inc.*, 125 F.3d 1176, 1183 (8th Cir. 1997); Hon. Barry Russell, *Bankruptcy Evidence Manual*, 2016 Ed., § 702:2.

A court as trier of fact may simply disregard an expert's opinion if the court concludes the expert is not credible.  *In re Lona*, 393 B.R. 1, 11 (Bankr. N.D. Cal. 2008), citing *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *In re 3DFX Interactive, Inc.*, 389 B.R. 842, 868 (Bankr. N.D. Cal. 2008).  The above-quoted excerpts of emails between Cossitt, Brandon and the chapter 7 estate's professionals reflect Cossitt's disappointment at not being employed by the Trustee as the estate's attorney, as he offered, and his frustration at being asked to provide information and opinions without compensation for his time.  Cossitt plainly stated in Ex. D:  "At this stage of the game, my concern about this aspect has to do far more with my 2nd tier admin claim than anything else."  The Moving Parties' Motion

27

to Remove Trustee requests that the chapter 7 administrative expenses be subordinated "below payment of all chapter 12 administrative expense," and that the Trustee be ordered to pay all of Debtors' legal expenses for Cossitt's services related to these matters, with respect to which Warren testified that Cossitt has billed Debtors $16,000 post-conversion.

This testimony is not the same as an objective expert being paid for his or her time to testify and give an expert opinion. Cossitt's statement regarding his concern for his own administrative claim, and the prayer of the Moving Parties' Motion to Remove Trustee, show Cossitt's economic motivation for a particular result, rather than to give an objective expert opinion. Cossitt's economic incentive in the result leaves this Court with no alternative, in its view, than to give little probative weight to Cossitt's opinion testimony and conclusions. *See Lona*, 393 B.R. at 11; *Bose Corp.*, 466 U.S. at 512; *3DFX Interactive, Inc.*, 389 B.R. at 868.

This Court construed § 324 in *In re Kurth Ranch*, 6 Mont. B.R. 429, 430 (Bankr. D. Mont. 1989). In *Kurth Ranch* some debtors filed a motion to remove and disqualify a trustee because the trustee's counsel and law firm partner had a brother who was in charge of viable credit for the Federal Land Bank. The Court concluded that there was not cause, nor even an appearance of impropriety, and declined to disqualify the trustee under § 324.[15] *Kurth Ranch*, 6 Mont. B.R. at 434.

The BAP analysis adopted by the Ninth Circuit in *AFI Holding* discussed 3 approaches to removal under § 324 followed by the various circuits. Under one approach followed by the Second Circuit a trustee will not be removed unless there is actual injury to the estate or fraud.

---

[15] The Court did, however, grant the motion to disqualify the trustee's counsel under 11 U.S.C. § 327(a) because the brother relationship gave rise to an indirect appearance of impropriety which failed the disinterestedness requirement. *Kurth Ranch*, 6 Mont. B.R. at 6-7.

*AFI Holding*, 550 F.3d at 846; *In re Freeport Italian Bakery, Inc.*, 340 F.2d 50, 54 (2nd Cir.

1965).  A second approach is a *per se* disqualification in the Fourth, Sixth and Eighth Circuits if a

trustee is determined to be not disinterested.  *AFI Holding*, 550 F.3d at 846-47 (citing cases).

The third approach, adopted in *AFI Holding* and the First and Third Circuits, holds that

there is no bright-line rule but rather that each case must be judged in the perspective of the

particular case and facts, and a proper test looks at the "full panoply of events and elements" or

the totality of the circumstances.  *AFI Holding*, 550 F.3d at 847-48; *In re Martin*, 817 F.2d 175,

181-83 (1st Cir. 1987); *In re BH & P Inc.*, 949 F.2d 1300, 1312-13 (3rd Cir. 1991).  *AFI Holding*

summarizes:  "It is well established that 'cause' may include trustee incompetence, violation of

the trustee's fiduciary duties, misconduct or failure to perform the trustee's duties, or lack of

disinterestedness or holding an interest adverse to the estate.  *AFI Holding*, 530 F.3d at 845,

citing 3 COLLIER ON BANKRUPTCY, ¶ 324.02.

Guided by *AFI Holding*, the Court will consider the "full panoply of events and elements"

in this case.  The Court observes first that the instant case is not a routine chapter 7 bankruptcy.

It began as separate chapter 12 cases involving real and personal property, farming operations

including crop leases and crop sharing arrangements, which were unwritten and subject to change

of conditions, manufacturing plant and equipment, state court foreclosure proceedings and an

appeal therefrom, competing security interests and claims.  At Debtors' request the two cases

were substantively consolidated.  The complexity of the issues involved and the difficulty in

addressing them are illustrated by the magnitude of Cossitt's chapter 12 administrative claim.

The Debtors' reorganization efforts were unsuccessful; they voluntarily converted the

consolidated cases to Chapter 7 on September 24, 2015, when Brandon was added to the case as

Trustee.

The Moving Parties allege breach of several fiduciary duties by Brandon, misconduct and failure to perform trustee's duties diligently and bias. The Court analyzes their contentions in the order raised in the Motion to Remove.

The Moving Parties first contend that Brandon breached her duties of diligence and to liquidate the DIP accounts in a timely manner. The DIP accounts are disclosed on Debtors' amended Schedules which were filed on October 7, 2015. The Moving Parties' Motion to Remove Trustee, which is dated February 4, 2016, alleges that the Trustee still had not taken possession of or closed the DIP accounts and the accounts still are opened and have balances in them. At the hearing Debtors offered no evidence in support of that contention.

Ex. 5 shows that the Trustee wrote Glacier Bank and Three Rivers Bank asking to close the DIP accounts on October 12, 2015, only 5 days after the amended Schedules were filed. Moreover, Brandon testified that she asked Debtors to close the DIP accounts, which she does in other cases and in which other debtors usually comply, but the Debtors refused. The Three Rivers Bank account was closed by October 23, 2015. Ex. 6. Ex. 7 shows that there was a delay in closing the Glacier Bank DIP account, but the evidence shows the delay was caused by the Trustee using the address provided to her by the Debtors. If the Debtors had closed the DIP accounts as Brandon requested, or if they had provided her with the correct address for Glacier Bank, the DIP account at Glacier Bank would have been closed sooner.

The Court cannot comprehend how the deposit of Warren's social security check in the Glacier Bank DIP account reasonably could be blamed on the Trustee. Ex. 7 shows that the social security check was deposited on November 23, 2015. There is no suggestion that Warren's

30

social security benefits, which he only recently began receiving, are not exempt income.  No party argues that his social security benefits are property of the estate.  There is no evidence that anyone other than Warren or someone acting on his behalf provided the Social Security Administration ("SSA") with the address where his social security should be deposited.  If it was deposited into his DIP account it happened because Warren did not notify the SSA to deposit it into a different bank account.  No fault regarding Warren's social security benefits can be attributed to the Trustee based on the evidence in this record.

In any event the last DIP account was closed, according to Ex. 7, by December 7, 2015.  No evidence exists in the record showing that any DIP accounts remain open with balances as alleged in the Motion to Remove Trustee dated February 4, 2016.  Thus with respect to the DIP accounts, the Moving Parties have failed to satisfy their burden to show any cause under § 324(a) for removal.

The Moving Parties' second contentions allege the Trustee breached duties of due care and diligence and to liquidate vehicle assets in a timely manner.  At the hearing Cossitt testified that their Motion to Remove no longer relies on the Trustee's administration of vehicles.  The Trustee began administering the estate's vehicles on November 24, 2015, when she gave notice of sale of a care and trailer to Debtors.  The evidence shows that may of the remaining vehicles were stored outside in poor repair.  After the auctioneer informed the Trustee that the vehicles were overvalued the Trustee moved to abandon the vehicles; they were abandoned without objection.  The Moving Parties failed to satisfy their burden to show any cause under § 324(a) for removal of the Trustee based on vehicles.

The Moving Parties' third set of contentions allege that the Trustee breached duties of due

31

care and diligence based on her failure to liquidate crops in a timely manner.  They contend that the Trustee failed to take possession and control or insure crops of the estate and that her delay during a drop in hay prices resulted in a $2,550 loss to estate asset value.

No evidence exists in the record showing that the Trustee caused the decline in hay prices or that she knew prices would decline.  Like other commodities, hay prices are cyclical.  If hay prices had risen instead of declined the value of the estate's interests in hay would have increased.

As for insurance, Brandon testified that the estate had only $1,000 available and could not afford to buy insurance.  That evidence is uncontroverted.  Furthermore, there were several competing interests in crops shown by the evidence, including disputed crop liens of WCU, part ownership interests in hay crops owned by Strasden which increased during the case, as well as Strasden's unwillingness to sell the hay crop.  When Strasden agreed to move forward with the sale, the Debtors had reached a settlement with WCU and Warren provided Brandon with phone numbers of prospective purchasers at the February 24, 2015 hearing.  The hay crop was sold by March 8, 2015.

The Trustee's focus was on investigating and settling the litigation assets, which the Court deems consistent with her duty of care.  The Debtors stated through Cossitt that they did not want to deal with creditors and only wanted one single on-site inspection.  They also did not want to be asked any questions without Cossitt present.  Cossitt left the state for almost a month before the § 341 meeting.

"A debtor invoking the protection of the Bankruptcy Code must shoulder the responsibilities attendant to this protection, including accounting for assets and completing

32

schedules in good faith, and may not engage in questionable or fraudulent conduct . . . ." *In re Hickman*, 384 B.R. 832, 841 (9th Cir. BAP 2008). The Debtors have a duty to cooperate with the Trustee "as necessary to enable the trustee to perform the trustee's duties . . . ." 11 U.S.C. § 521(a)(3); *In re CMC, LLC*, 19 Mont. B.R. 472, 478 (Bankr. D. Mont. 2002); *In re Mahaffey*, 18 Mont. B.R. 285 (Bankr. D. Mont. 2000). Cossitt's emails to the Trustee and her professionals acknowledge Debtors' duty to cooperate, but he then repeatedly tried to limit Debtors' cooperation such as insisting on one single on-site inspection or conditioning the Trustee's inspection of the estate's pellet equipment. Finally Cossitt outright refused another inspection in Ex. 32, stating that the Trustee abandoned the real estate and no longer has permission to access it and that the two prior inspections by the Trustee "have fulfilled the duty of reasonable cooperation."

This Court specifically rejects, as a matter of law, the Moving Parties' contention that they fulfilled some duty of "reasonable cooperation." The Trustee did not, nor was she required to, limit herself to a single on-site inspection of property of the estate. Cossitt argued that the Debtors wondered when it would end and did not want to submit to requests for inspection *ad infinitum*. This Court need not decide based on this record how much cooperation would be unreasonable. It simply is not a debtor's or a debtor's attorney's decision to make, whether to cooperate with a trustee under § 521(a)(3), or how much cooperation is reasonable.

Brandon did not request that the Debtors perform physical labor or deliver assets to her or make any other unreasonable requests. She simply asked to come on to their property and inspect estate assets which were the subject of conflicting interests. Cossitt's unilateral refusal to allow the Trustee to inspect crops was contrary to their duty to cooperate under § 521(a)(e) "with the

33

trustee as necessary to enable the trustee to perform the trustee's duties . . . ."  The Moving Parties failed to satisfy their burden to show any cause under § 324(a) for removal of the Trustee based on crops.

Debtors next contend that Brandon breached her duty of loyalty and to maximize distributions, based on her employment of the Goetz firm as special legal counsel for the estate to defend her against the Motion to Remove Trustee.  Debtors argue that Brandon has a fiduciary duty to the estate to shift the burden of the administrative expense to herself individually instead of the estate, in order to maximize distributions to creditors.

The Court at the February 24, 2016 hearing denied the Debtors' motion to reconsider its order approving the Trustee's application to employ the Goetz firm to defend her.  Brandon's fee agreement with the Goetz firm provided that its fees would be payable by the estate, or by Brandon individually.  Debtors cite no case authority which holds that a trustee has a duty to pay estate professionals individually for their defense against a motion to remove under § 324(a). The Motion to Remove is based on Brandon's actions and conduct as Trustee of this estate, not as an individual.

Brandon employed the Goetz firm under 11 U.S.C. § 327, which authorizes a trustee to employ attorneys and other professionals.  That action was consistent with Montana Rule of Professional Conduct 3.7 ("Lawyer as Witness – (a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness . . . .") because she expected to be a witness for the Motion to Remove Trustee.  The Goetz firm has not filed an application for compensation from the estate, but reasonable compensation for services rendered by a professional person is authorized under 11 U.S.C. § 330(a)(1).  Since the Trustee has not yet

34

asked for compensation for the Goetz firm, the Debtors' argument for removal based upon the Goetz firm's administrative claims is premature.

More pertinent, however, Debtors urge this Court to construe § 324(a) in a manner so as to remove the Trustee in spite of her right to seek compensation under a more specific statute, § 330(a).  Two canons of statutory construction require that this Court avoid such a construction. The first is that courts should disfavor interpretations of statutes that render statutory language superfluous and so long as there is no positive repugnancy between two laws, a court must give effect to both.  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 252-54 (1992).  The second canon requires that "[w]here both a specific and a general statute address the same subject matter, the specific one takes precedence regardless of the sequence of the enactment, and must be applied first."  *In re Padilla*, 222 F.3d 1184, 1192 (9th Cir. 2000), citing *In re Khan*, 172 B.R. 613, 624 (Bankr. D. Minn.1994) (citing *Busic v. United States*, 446 U.S. 398, 406 (1980) and *Preiser v. Rodriguez*, 411 U.S. 475, 489-90 (1973)).

Applying these canons of statutory construction, because § 330(a) is more specific in authorizing a trustee to compensate professionals, this Court declines to construe § 324(a) in a manner to remove the Trustee based on the future possibility that she may seek compensation of estate professionals from the estate under § 330(a).  The Court concludes that the Moving Parties failed to satisfy their burden to show cause under § 324(a) for removal of the Trustee based on her employment of the Goetz firm.

The Moving Parties next two contentions involve what they characterize their "redemption right exemption."  They allege that the Trustee breached her duties of due care, diligence, impartiality, and good faith and fair dealing by failing to object to Debtors' redemption

rights exemption and by attempting to sell their redemption rights in their settlement with WCU.

At least in part, these contentions are moot because of the settlement announced at the hearing at

Doc. 256 between Debtors, WCU, the Trustee and BFI.  This Court approved that settlement at

Doc. 257; no timely objection and request for relief therefrom has been filed.  Warren testified

that the settlement resolved his anxiety about the redemption rights.

The Moving Parties argue that they are entitled to an exemption in their redemption rights

because the Trustee did not file a timely objection and that the Trustee breached her duty to

Debtors by trying to convert their right of redemption and right of possession in an earlier

settlement.  The Debtors' right to an exemption in a right of redemption has not been submitted

to this Court in a procedurally proper manner; therefore, this Court does not decide that issue in

this § 324(a) contested motion.

The Moving Parties cite a decision of this Court *In re Ellis*, 2008 WL 3878001, *5

(Bankr. D. Mont. 2008), in which this Court sustained a trustee's objection to a debtor's claim of

homestead exemption in "Equity of Redemption from foreclosure sale of residence" because

under Montana law a statutory right of redemption is a bare personal privilege and the debtor's

attempt to claim a homestead exemption in a bare personal privilege was contrary to Montana's

homestead exemption statutes.  *Id.*

Official Form 6C, Schedule C ("Property Claimed as Exempt"), includes a column which

requires that debtors "Specify Law Providing Each Exemption."  Mont. LBR 4003-1 ("Claims of

Exemptions") requires that the Montana Code Annotated ("MCA") section "under which each

exemption is claimed . . . shall be described with specificity."  Debtors' amended Schedule C lists

MCA §§ 70-32-104, 105 & 25-13-615 as the basis for their homestead exemption.  Those

statutes, and in particular Title 25, chapter 13, part 6, are specifically listed at MCA § 31-2-106(1) among the Montana statutes based upon which an individual may exempt from property of the estate in any bankruptcy proceeding. The Montana statutory right of redemption is found at Title 25, chapter 13, part 8, which is not among the statutes specifically listed at § 31-2-106(1). "Where Congress includes particular language in one section of a statute but omits it in another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993). The same principle applies in construction of Montana statutes. Debtors may not exempt a Montana statutory right of redemption from property of the estate. MCA § 31-2-106(1).

Furthermore, Debtors did not claim an exemption in their statutory right of redemption. Their amended Schedule C did not claim an exemption in the right of redemption provided for a judgment debtor and spouse at MCA 25-13-801(a) (authorizing a judgment debtor and the judgment debtor's spouse to redeem), as required by Mont. LBR 4003-1. Cossitt's suggestion that the claimed exemption in the right of possession alludes to a claim of exemption in the right of redemption is contrary to the requirement of Official Form 6C, and LBR 4003-1. They state in red print on amended Schedule C: "Homestead exemption is also based on the right of possession during the redemption period per MCA 25-13-821." The right of possession under MCA § 25-13-821 suffers from the same omission from MCA § 31-2-106(1) as does the rest of part 8 of Title 25, chapter 13, and therefore Debtors were not authorized to exempt their right of possession either.

Because of the approved settlement binding the parties, which includes the rights of redemption and possession, payment, releases and quit claim deeds, the Trustee's failure to object

to Debtors' claims of exemption in the right of redemption and right of possession now is moot. The Court concludes that the Moving Parties failed to satisfy their burden to show cause under § 324(a) for removal of the Trustee based on the Debtors' redemption rights.

The Moving Parties' final contention for removal of the Trustee is that her failure to use the appropriate local bankruptcy forms for a stipulation to modify stay (LBF8-B), failure to include the Debtors, and failure to use LBF 11 ("Notice of Trustee's Intent to Abandon Property") as required by Mont. LBR 4001-1(d) and LBR 6007-1(a), respectively, constitute breach of the Trustee's duties of proper litigation preparation and bias toward Debtors in the first proposed settlements. The Moving Parties accuse the Trustee of reckless and cavalier disregard for the Debtors and a "gross and inexcusable violation of LBR 1001-1(b)."

The Trustee responds that she appreciates the importance of following the local rules and forms, that it is her usual practice to use the local forms and she will in the future. However, she argues, her failure to use the local forms was only a "minor misstep" in the first settlement which is not grounds for the drastic remedy of removal. The Court agrees.

Local Rule 1001-1(b) provides: "Unless otherwise indicated, each of these Local Rules applies to cases commenced under Chapters 7, 9, 11, 12, 15 and 15 of the U.S. Bankruptcy Code and to all Adversary Proceedings." LBR 4001-1(d) requires that a stipulation to modify stay "filed in compliance with LBF 8-B, joined by the creditor, debtor, and trustee" may be filed without fee. LBR 6007-1(a) requires that abandonment of property shall be accomplished in conformity with LBF 11.

Instead of utilizing LBF 8-B and LBF 11, the Trustee stated that, because of the relief requested by WCU and BFI, she combined the relief requested in pleadings which she contended

38

provided much of the required information, though not all called for by the local forms.  In hindsight, everyone agrees the Trustee would have been better off to follow the local rules and file the completed local forms.  Her failure to comply with the local rules and forms resulted in Cossitt filing objections and, thus, her withdrawal of the first settlement motions.

The Court deems it significant that Cossitt's law firm is the only complaining creditor seeking removal of the Trustee.  *See* 3 Collier on Bankruptcy, ¶ 324.02.  The Court also deems it significant that Cossitt testified that he filed the objections to the first settlement motions without first attempting to resolve his objections informally.  The Trustee argues that she would have withdrawn the first settlement motions to address Cossitt's concerns about missing information with a simple phone call.  The Trustee in fact withdrew the first settlement motions and continued her pursuit of settlement successfully through the eve of the hearing on the Motion to Remove her as Trustee.

Mont. LBR 9029-1(a)(2) provides:  "Suspension of Rules.  The Court, upon its own motion or the motion of any party, may change or dispense with any of these Local Rules in the interests of justice."  This rule suggests that in appropriate circumstances the local rules may be dispensed with and therefore the failure to follow the local rules need not result in such an extreme remedy as removal.  The Court does, however, expect parties to normally use the approved forms, but recognizes some matters come before this Court that do not always fit nicely into the approved text of the form.

Cossitt and Brandon agreed that the majority of administration of this case is complete. The Trustee, Debtors, WCU and BFI have entered into a settlement which has been approved. Most of the property of the estate has been administered.  Cossitt suggested that removal of

Brandon as Trustee would allow a replacement trustee to be appointed and reexamine WCU's and BFI's Proofs of Claim.  However, given the approved settlement between the parties this Court will closely scrutinize any attempt to revisit the settlement terms and the Debtors withdrew their objections to WCU's and BFI's Proofs of Claim.

The Moving Parties request that Brandon be removed as Trustee, that chapter 7 administrative expenses be subordinated to the chapter 12 administrative claims of Cossitt and other administrative claimants, that the Trustee be prohibited from any compensation and that Brandon be ordered to pay all of the Debtors' legal expenses related to the Motion to Remove. Having considered the "full panoply of events and elements" in this case, this Court in its discretion declines to find sufficient "cause" under § 324(a) to remove Brandon as Trustee. *AFI Holding*, 530 F.3d at 844-45, 848.  Frankly, the Court is struck by the severity of the relief requested when the only specific facts shown by the evidence, which questionably support removal, are that the Trustee failed to utilize local forms, a failure which she rectified by withdrawal.

The Trustee's failure to follow local rules and use local forms is the weightiest evidence shown in this record and may be viewed as evidence of lack of detail, but the Court concludes that it is insufficient for the extreme remedy of removal. *See In re Log & Conventional Homes, Inc.*, 2011 WL 7145883 at *4.   The Court concludes that the Moving Parties failed to satisfy their burden to show sufficient cause under § 324(a) for removal of the Trustee based on the Trustee's failure to utilize appropriate local bankruptcy forms, which would not, if ever by itself, warrant removal, as other less severe remedies are available that the Court can apply to resolve improper utilization of forms.

Based on the foregoing,

**IT IS ORDERED** a separate Order shall be entered denying the "2nd Amended &

Substituted Motion to Remove Chapter 7 Trustee" (Document No. 216 in Case No. 15-60092-7)

filed by the Debtors and administrative creditor James H. Cossitt, PC.


Honorable Ralph B. Kirscher
Chief U.S. Bankruptcy Judge